## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| United States of America, | : |
|  | : |
| Plaintiffs, | : |
|  | : |
| v. | : |
|  | : |
| Ghenet Mesfun, | : |
|  | : |
| Defendant. | : |

**OPINION**
Crim. No. 05-858 (WHW)

**Walls, Senior District Judge**

### INTRODUCTION

The Government moves for the involuntary administration of anti-psychotic medication to Defendant Ghenet Mesfun to render her competent to stand trial. (Docket Item 57). By indictment, defendant Ghenet Mesfun and her husband have been charged with eight counts relating to the alleged involuntary servitude of an Eritrean native. (Indictment, Docket Item 1). Based upon an unopposed Government motion to determine Defendant's competency for the purposes of standing trial (Motion, Docket Item 28), this Court ordered that Defendant be submitted to a mental competency examination. (Order, Docket Item 29). As a result of that competency evaluation, the Government now moves to have Defendant involuntarily medicated, pursuant to the Supreme Court's decision in Sell v. United States, 539 U.S. 166 (2003), in order to restore her competency for trial.

According to Sell, a court may order the involuntary medication of a defendant to render that person competent to stand trial if it draws four conclusions – (1) "important governmental interests are at stake;" (2) "involuntary medication will significantly further those concomitant state interests;" (3) "involuntary medication is necessary to further those interests;" and (4) "administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition." Sell, 539 U.S. at 180-81 (emphasis added). The Government argues that it has satisfied all four of the Sell factors by the medical reports entered into the record and the expert testimony presented at the Sell hearing (June 19, 2008). Defendant opposes the Government's motion on the basis that the Government has failed to satisfy its Sell burden to establish that involuntary administration of antipsychotic medication is medically appropriate and substantially likely to restore defendant to mental competency. The Court grants the Government's motion.

## BACKGROUND

### A. Underlying Criminal Charges

Defendant and her husband are charged with subjecting a live-in housekeeper, of native Eritrean origin, to conditions amounting to involuntary servitude. In the eight-count Indictment, Defendant faces maximum penalties ranging from five years, see 18 U.S.C. § 875(c), to twenty years, see 18 U.S.C. §§ 1512(b)(3), 1584, 1589(2). (Indictment, Docket Item 1).  Under the guideline range for each offense, Defendant faces advisory sentences ranging from ten to sixteen months, see 18 U.S.C. § 875(c); 8 U.S.C. § 1324(a)(1)(A)(iii), to forty-one to fifty-one months,

18 U.S.C. §§ 1584, 1589(2), assuming that Defendant has a Criminal History Category of zero or one.[1]

### B. Competency Evaluation

On April 21, 2006, the Court granted the Government's unopposed motion for mental competency examination of Defendant. (Order, Docket Item 29). As a result, Defendant was admitted to the Metropolitan Correctional Center ("MCC") New York on May 29, 2006. In a June 28, 2006 Competency to Stand Trial and Criminal Responsibility Evaluation, William Ryan, Ph.D. concluded that Defendant was not competent to stand trial. (Motion, Docket Item 43, Ex. A ("June 28, 2006 Eval.")). Specifically, Dr. Ryan offered "with less than the usual degree of psychological certainty" the following opinions relating to Defendant's competency to stand trial:

> 1.      Regarding the issue of Mental Disease or Defect . . . Ms. Mesfun currently does present with a Mental Disease under the law, specifically Brief Psychotic Disorder, With Marked Stressors and Paranoid Personality Disorder. Ms. Mesfun does not present with a Mental Defect.
>
> 2.      Regarding the issue of Competency to Stand Trial . . . Ms. Mesfun currently does not possess a rational and factual understanding of the proceedings against her, does not have the capacity to assist legal counsel in her defense, nor can she rationally make decisions regarding legal strategy. Therefore, . . . Ms. Mesfun is Not Competent to Stand Trial.
>
> 3.      If in the wisdom of the Court, Ms. Mesfun is determined to be Not Competent to Stand Trial, it is recommended she be sent

---

[1] The Court is not expressing any opinion as to the Criminal History Category of Defendant.

> away for restoration of competency, pursuant to Title 18, U.S.C.,
> Section 4241d.

(Id. at 7-8.) As a result of Dr. Ryan's findings, the Government moved on September 22, 2006

for an order adopting an incompetency finding and ordering commitment of Defendant for

restoration of competency pursuant to 18 U.S.C. § 4241(d). (Motion, Docket Item 43). The

Court convened a status conference and directed Defendant's counsel to obtain a separate

psychiatric evaluation of Defendant in preparation for a competency hearing. In a February 28,

2007 report, Joel S. Federbush, M.D. also concluded "with reasonable medical certainty" that

Defendant Ms. Mesfun "shows current signs and symptoms of mental illness (disorganized

thinking, paranoid ideation)" and that she was not competent to stand trial. (Feb. 28, 2007

Report, Docket Item 49-2). The Court held a competency hearing on May 31, 2007, and on that

same date, granted the Government's motion for an order adopting incompetency finding and

commitment of Defendant for restoration to competency pursuant to 18 U.S.C. § 4241(d).

(Order, Docket Item 51).

### C. Forensic Evaluation for Restoration of Competency

Defendant was then referred to the Federal Medical Center ("FMC") Carswell in Fort

Worth, Texas for purposes of restoration of competency. Attached to a November 16, 2007 letter

from Warden W. Elaine Chapman at FMC Carswell, the Court received a November 2, 2007

Forensic Evaluation submitted by Robert E. Gregg, Ph.D. and a November 13, 2007 Psychiatric

Report submitted by Judith Cherry, D.O. Dr. Gregg concluded that Defendant is incompetent to

stand trial, that she will remain incompetent to stand trial without psychotropic medication,

which she currently refuses, that Defendant is not dangerous to herself or to others, and that there

-4-

are no less intrusive alternatives to restore competency than psychotropic medication. (Nov. 2, 2007 Eval.). Dr. Cherry concluded that Defendant requires treatment with psychotropic medication, that other less intrusive forms of treatment have shown to be completely ineffective, that given Defendant's likely refusal of oral medication, injectable long acting antipsychotic medication is necessary, and that most of the side effects, especially the more severe ones, are rare and can be dealt with by treatment strategies or by changing the medication and likely will not interfere with the fairness of trial. (Nov. 13, 2007 Report).

According to Dr. Gregg, Defendant has refused to participate in psychiatric and psychological evaluation or treatment. (Nov. 2, 2007 Eval. at 1). As part of the evaluation process, Dr. Gregg reviewed the Court's May 31, 2007 Order (Docket Item 51), the Indictment (Docket Item 1), the December 8, 2005, December 12, 2005, December 29, 2005, and February 28, 2006 bail hearing transcripts, Dr. Simring's January 3, 2006 Evaluation, Dr. Ryan's June 28, 2006 Evaluation, Dr. Federbush's February 28, 2007 Report, and the entire medical and psychological record generated during the course of Defendant's hospitalization at FMC Carswell. (Nov. 2, 2007 Eval. at 1).

Dr. Gregg reported that since her arrival at FMC Carswell, Defendant has been housed in the Psychiatric Seclusion Unit after refusing to sign waivers permitting her to be housed with psychiatric patients or convicted inmates because "she adamantly stated that she was not mentally ill." (Id. at 2). Dr. Gregg stated that Defendant "has not posed any disciplinary concerns, nor has she acted in overtly aggressive manner toward staff." (Id.). Defendant "has consented to having a roommate on several occasions," but she "invariably became irritated with

-5-

her roommates and began staring at them in an intimidating fashion" and "complain[ed] to staff

about her roommates' behavior," leading to the movement of her roommates. (Id.). In addition,

Defendant has "periods of screaming and praying loudly in her cell, pacing the room, and staring

in an intimidating fashion through the window of her cell at staff who attempt to interact with

her" and has "accused staff of lying to her, and on one occasion, accused an officer of 'cutting'

her arm while she slept," though after examination, medical staff concluded it was just a

"scratch." (Id.). According to Dr. Gregg, however, Defendant does not pose a risk to her own

safety or that of other's and has maintained adequate nutrition and personal hygiene, so at that

time there had been no occasion warranting the need to medicate on an emergency basis (Id. at

3).

Dr. Gregg recounted that although Defendant refuses to submit to psychological or

psychiatric examination, her discussions with staff indicates "paranoid thoughts concerning her

prosecution, behaviors and intentions of those around her in her current setting and concerning

authorities who have intervened in her family situation in the past." (Id.). Further, Defendant

"has extremely poor insight into her psychological functioning and her level of judgement [sic] is

poor." (Id.). Dr. Gregg noted, however, that "[h]er personal appearance and hygiene are within

normal limits," that "[h]er speech is of generally normal volume, though minimal," and that

"[h]er level of intelligence is estimated to be in the average range." (Id.). After conceding that

Defendant's "lack of cooperation makes an accurate diagnosis of her illness extremely difficult,"

Dr. Gregg provided that "some impairment in reality testing can be inferred from her irrational

reaction to her circumstances" and that "[s]he also manifests paranoid attitudes in both her behavior and speech." (Id.).

Dr. Gregg concluded that psychotropic medication is the only means to restore Defendant to competence. (Id.). And, given that Defendant refuses psychotropic medication, Dr. Gregg suggested that "forcibly medicating Ms. Mesfun is [their] only viable treatment option." (Id.). Claiming to advise the Court on three of the Sell criteria, Dr. Gregg stated, in summary fashion, (1) that "in [their] opinion, psychotropic medication is a medically appropriate treatment for Ms. Mesfun's illness," (2) that "it is [their] opinion that medication can be prescribed which will be substantially unlikely to have side effects which undermine the trial's fairness," and (3) that "it is [their] opinion that no less-intrusive alternatives exist which will effectively treat Ms. Mesfun's mental illness." (Id. at 4).

Dr. Gregg's prognosis of Defendant's condition was "guarded." (Id.). He reported that they "expect that Ms. Mesfun would demonstrate a positive response to psychiatric treatment," which "[i]f she were to receive" would increase her prognosis to "fair to good," but that she continues to deny that she might be mentally ill and, as a result, will not accept such treatment, necessitating forced medication. (Id.). "[B]ased on behavioral observations" (as opposed to psychiatric examination, which Defendant refuses), Dr. Gregg's opinion is that Defendant "suffers from a severe mental disease which renders her unable to understand the nature and consequences of the proceedings against her and to assist properly in her defense." (Id. at 5.) In

addition, his opinion is that "there is a substantial probability Ms. Mesfun will become competent following psychiatric treatment." (Id.).[2]

Dr. Cherry reported that her first option for treatment of Defendant's condition would be "atypical antipsychotic medication" (as opposed to "typical antipsychotics") because "they have less potential to cause the more difficult long term side effects of movement disorders." (Nov. 13, 2007 Report at 1). Given Defendant's likely refusal to consent to taking an oral medication, she concluded that they will probably be forced to use an "injectable long acting antipsychotic medication," of which there are only three options – (1) Haldol Decanoate or (2) Prolixin Decanoate, which are of "the older typical class of antipsychotic medication" meaning they have "some of the more troublesome significant side effects," or (3) Risperdal Constra, which is a "long acting atypical antipsychotic," but "is associated with some possible metabolic side effects . . . and occasionally the response to this medication is slower and less robust" than with the other two options (Id.). Dr. Cherry was sure to note, however, that "these drugs are relatively safe" and that "[t]hey have been used in the treatment of millions of people with major benefit and relatively minor risk of serious side effects." (Id.).

Dr. Cherry then listed some "[s]erious and potentially fatal side effects:"

- Agranulocytosis – a "potentially fatal reduction in the white blood cell count" – that primarily occurs with a drug called Clozaril (Clozapine), but

---

[2]  Dr. Gregg indicated that on November 1, 2007, a Due Process Hearing was held, presumably in accordance with 28 C.F.R. § 549.43(a), wherein Defendant was informed that she was in need of psychiatric medication.

that is "effectively prevented" through monitoring the white blood cell
count;

- Sudden death due to cardiac arrhythmia that generally occurs with a drug
  called Mellaril (Thioridazine), which is "no longer widely used;"

- Neuroleptic malignant syndrome – a "rare, potentially fatal illness due to
  excessive dopamine stimulation" – that "can be reversed by effective
  treatment."

(Id.). Another non-fatal, but troublesome side effect is tardive dyskinesia – "a condition that is

characterized by abnormal repetitive, often writhing movements of muscles of the tongue and

mouth, but at times of muscles in other parts of the body" – which can be "irreversible," but if

detected early and if medication is stopped, "it will sometimes disappear." (Id. at 2). Tardive

dyskinesia "most often occurs over the age of 50 and after long term treatment with relatively

high doses of the older antipsychotic medications" and "occurs less frequently and perhaps not at

all, with the so-called atypical antipsychotic medications such Abilify, Clozaril, Risperdal,

Zyprexa, Seroquel and Geodon." (Id.). Other "bothersome," but "less serious" side effects

include muscle stiffness, restlessness, sedation, low blood pressure, weight gain, dry mouth,

lowering of seizure threshold, elevated prolactin (which "could cause enlarged breasts or

inappropriate lactation"), and the possibility of elevated glucose and lipids ("causing the

development of diabetes mellitus in individuals who are predisposed to develop that illness,"

which "may or may not be reversible by stopping the medication"). (Id.).

According to Dr. Cherry, most side effects are "rare" and "when they do occur, they can be effectively dealt with by treatment strategies or by changing medication." (Id.). She noted that "in [her] experience treating individuals with this type of problem, [she] has never encountered a side effect that endangered the fairness of a trial." (Id.). And, specifically with respect to "sedation," "the effect tends to lessen over time and whatever effect remains is completely offset by the improvement in rational thought and the lessening of inappropriate emotions." (Id.).

### D. Motion of Involuntary Medication

On December 4, 2007, the Court forwarded Warden Chapman's November 16, 2007 letter, Dr. Gregg's November 2, 2007 Forensic Evaluation, and Dr. Cherry's November 13, 2007 Psychiatric Report to the Government and Defendant's counsel (Dec. 4, 2007 Letter). The cover letter sent with these enclosures requested that the Government inform the Court as to its position in light of the findings of the Forensic Evaluation and Psychiatric Report by December 17, 2007, and instructed the Government that if it wished for the Court to order the involuntary medication of Defendant for restoration of competency for trial, the Court would be holding a hearing in accordance with Sell. (Id.). On December 20, 2007, the Government responded to the Court's letter with a request for an extension of time regarding its position as to the forcible medication of Defendant for purpose of restoration of competency. (Motion, Docket Item 54). After receiving assurance from the Government that Defendant's counsel consented to its requested extension, the Court granted the Government's request for an extension, resetting the deadline for its response to the Court's December 4, 2007 letter to January 4, 2008. (Order, Docket Item

55).  On January 4, 2008, the Government moved for an order to authorize involuntary

medication for purpose of restoration of competency to stand trial.  (Motion, Docket Item 57).

The Court entered a stipulated scheduling order on January 14, 2008, setting deadlines for

Defendant's opposition and the Government's reply.  (Order, Docket Item 59).[3]  In a February

26, 2008 letter, Defendant's counsel indicated that "[g]iven Ms. Mesfun's condition at this stage,

I do not believe I am in a position to oppose the Government's motion."  (Letter, Docket Item

62).  Defendant's counsel noted, however, that Defendant "has now been incarcerated pretrial for

over two years, and a substantial portion of that time was spent in Passaic County Jail under

harsh conditions" and requested that if the Court grants the Government's motion, "the period of

restoration . . . be as short as possible."  (Id.).

### E. Emergency Involuntary Administration of Medication Prior to Sell Hearing

The Sell hearing was scheduled for June 19, 2008. Before the hearing, the Government

forwarded Drs. Gregg and Cherry's May 8, 2008 Mental Health Update to the Court on May 15,

2008.  According to those doctors, Defendant "suffers from a major mental illness with psychosis

being the primary symptom."  (May 8, 2008 Update at 1.)  They reported that Defendant

"repeatedly denies having a mental illness" and is "paranoid and delusional," recently telling

"staff members that a mental health nurse and the chief psychiatrist have assembled a large group

of inmates for the purpose of assaulting her."  (Id.).  Drs. Gregg and Cherry stated that "[s]he, at

---

[3]  As a result of a request by Defendant's counsel, the Court entered a January 23, 2008
order to allow Defendant to remain at FMC Carswell for the pendency of the Government's
motion for involuntary medication, rather than requiring her to travel to Newark for the purpose
of resolving the motion.  (Order (Docket Item 61).)

times, refuses to leave her cell even to shower, and . . . steadfastly refuses to consider leaving her seclusion cell" and that she "also bangs on her door for long periods occasionally . . . yell[ing] nonsensical phrases in a loud and bizarre almost chanting fashion, and is unresponsive to attempts to soothe her."  (Id.).  They maintained, however, that "[s]he is currently maintaining adequate hygiene and nutrition and is not exhibiting behavior considered dangerous to herself or others."  (Id.).

Drs. Gregg and Cherry recounted that in the past months, however, Defendant was given emergency medication on two occasions due to "psychotic behavior that was compromising her own safety."  (Id.).  They noted further that "after being given emergency psychiatric medication, [Defendant's] behavior improved markedly for several days, suggesting the potential for positive response to treatment with psychiatric medications."  (Id.).  First, on February 28, 2008,[4] Defendant was emergently medicated with Haloperidol, Diphenhydramine, and Lorazepam when "she tied a torn piece of sheet around her neck and told staff members it was to hold her veins in place."  (Id.).  According to the doctors, Defendant refused to remove the sheet, "except briefly for a nurse," but she then retied it tightly.  (Id.).  Second, on March 18, 2008, Defendant was again emergently medicated with Haloperidol, Diphenhydramine, and Lorazepam "for the purpose of moving her to a clean cell and giving her medications to improve her mental functioning to help her regarding maintaining at least minimal hygiene" because Defendant was "refusing to clean herself and began urinating on the floor and walking in it."  (Id.).

---

[4]  The Mental Health Update indicated a date of February 28, 2007, but this is likely a typographical error, as neither Dr. Gregg's November 2, 2007 Forensic Evaluation, nor Dr. Cherry's November 13, 2007 Psychiatric Report mentioned this incident.

-12-

Drs. Gregg and Cherry stated that Defendant requires treatment with antipsychotic medication and that "[o]ther less intrusive forms of treatment, such as psychotherapy have shown to be completely ineffective and Ms. Mesfun has no receptivity to psychotherapy since she does not believe that she is mentally ill." (Id. at 2.) The doctors noted again that Defendant "has shown an ability to respond to antipsychotic medication on the two occasions of being administered emergency medications at this facility." (Id.). And, they reiterated that Defendant "does not currently represent a danger to herself or others." (Id.).

On May 19, 2008, the Court wrote to Drs. Gregg and Cherry to determine whether, in their medical opinions, Defendant was fit to travel to New Jersey for the Sell hearing. (May 19, 2008 Letter.) Dr. Gregg responded on May 23, 2008, that Defendant "remains quite unstable behaviorally and currently is so suspicious of others that she refuses to leave her cell even to bathe," noting that she "recently tied a string around her neck and threatened to choke herself." (May 23, 2008 Letter). In order to come to New Jersey for a hearing, Dr. Gregg stated that Defendant "would require a direct flight by air ambulance" and "would need to be constantly observed and maintained on Suicide Watch while in transit and following arrival." (Id.). The Court determined that it would not require Defendant to travel to New Jersey for the hearing.

### F. Expert Testimony at Sell Hearing

At the June 19, 2007 Sell hearing the Government called both Dr. Gregg and Dr. Cherry as witnesses to offer additional testimony as to the necessity for involuntary medication of Defendant in order to restore competency for trial. Defendant's counsel did not call any witnesses but did engage in lengthy cross-examination of both Drs. Gregg and Cherry.

-13-

I. Testimony of Dr. Gregg

At the hearing, Dr. Gregg testified that he believed Defendant "had a psychosis, that's a severe mental illness." (Tr. at 12). Dr. Gregg described the "primary feature" of Defendant's psychosis as "delusional thoughts [that] are fixed beliefs that persist despite evidence to the contrary." (Tr. at 14). This diagnosis was based upon Dr. Gregg's observations of Defendant and previous reports that detailed "at least one previous episode of acute mental illness" where Defendant "was carrying her daughter, approaching a stranger's home and saying that someone is attempting to kill her. After, [Defendant] approached a river still holding the child, officers restrained her whereupon she became violent and claimed the communists were trying to recruit her daughter into the military or kill her daughter." (Tr. at 12-13). Dr. Gregg also referred to the two incidents outlined in the May 8, 2008 update as further examples of Defendant's belief that "other people are attempting to kill her or harm her."  (Tr. at 14-15).

When asked on cross-examination whether the beating and cutting Defendant suffered while in detention before coming to FMC may have contributed to this psychosis, Dr. Gregg testified that he was unaware of such incidents but that they would not be significant to his diagnosis "because [Defendant]'s in a different place and different time. Because we are talking about now what happens now and reality, not what has happened in the past." (Tr. at 32). Dr. Gregg acknowledged that in a June, 2006 mental health report a Dr. Simring did not diagnose Defendant with any mental illness. (Tr. at 34). Dr. Gregg also acknowledged that "there has been no definitive diagnosis" of Defendant's condition because of the inability to engage Defendant in an extensive evaluation. (Tr. at 35).

When asked by the Court about the Defendant's demeanor after the two emergency involuntary medication incidents, Dr. Gregg said that Defendant was more communicative and "spoke... about day-to-day things that happened in the unit where she is housed" but that whenhe asked her to come out of her cell to speak with him "she declined." (Tr. at 20). On cross-examination, Dr. Greg further noted that after medication Defendant was "a little bit more willing to speak with me" but "she would not engage in psychotherapeutic interaction or psychodiagnostic interaction." (Tr. at 37).

Regarding the possibility of restoration of competency, Dr. Gregg opined that based upon "research that had been published concerning people with delusional disorder" he estimated that if Defendant responded well to the antipsychotic medication "there is probably a 75 percent change that she would improve to the point where she would be competent to stand trial." (Tr. at 23). On cross-examination, Dr. Gregg defended this estimate by testifying that the research was relevant to Defendant's diagnosis of "psychosis not otherwise specified" since "the clinical presentation is delusions" and the research is "as specific as it's going to get under these circumstances." (Tr. at 36).

Dr. Gregg repeated his conclusion that there were no "less intrusive means of addressing her and competency" since "for a less intrusive means to work, a person must collaborate, and Miss Mesfun is incapable of collaboration." (Tr. at 24). When asked whether placing Defendant in a more familiar environment may make her more likely to cooperate in treatment, Dr. Gregg testified that "I have no reason to believe that she will accept the medication even if she is in her home environment... while it might improve her, she might be more comfortable, I don't think

it's going to impact her delusional belief system." (Tr. at 46). Dr. Gregg also restated his

conclusion that Defendant was not a danger to herself and added that in his belief "if she were

engaged in mental health treatment... then I could certainly see where she may be able to be

released to the community." (Tr. at 25).

ii. Testimony of Dr. Cherry

Dr. Cherry concurred with Dr. Gregg's diagnosis of "psychosis not otherwise specified."

(Tr. at 54). Dr. Cherry related that her conclusion was based upon the "psychotic break"

involving Defendant's child, Defendant's "lack of cooperation with the prior forensic

evaluation", Dr. Cherry's "observations of Miss Mesfun [] from going to the observation unit and

visiting her and attempting to talk to her" and daily reports of Defendant's condition from nurses

and correctional officers in the observation unit. (Tr. at 52-53). Dr. Cherry admitted that she has

not had the benefit of speaking with Defendant about her mental condition. (Tr. at 83). Dr.

Cherry also admitted that another psychiatrist, Dr. Yi, had been able to interact with the

Defendant since "when [Defendant] first meets most clinicians she is much more talkative, much

more open" but that "[Defendant] later became much more paranoid and guarded and wouldn't

speak to [Dr. Yi]." (Tr. at 84-85).

Dr. Cherry also provided further details about the involuntary medication of the

Defendant following the two incidents outlined in the May 8, 2008 report. Regarding the first

incident, "in February Miss Mesfun tied a ligature around her neck and told staff that it was to

hold her what she called her neck veins in place" which resulted "in some facial swelling" that

caused Dr. Cherry to fear that Defendant "would strangle herself." (Tr. at 55). Defendant was

-16-

"given an injection of Haldol and Ativan and Benadryl for side effects." (Id.). Dr. Cherry described Haldol as "an anti-psychotic... that was given to clarify her thinking and so that she could be more rational and, you know, not engage in that kind of behavior." (Id.). The second incident occurred in March 2008 when Defendant "began really neglecting her hygiene... started urinating on the floor and walking around in it." (Tr. at 56). In that incident, Dr. Cherry injected Defendant with "Haldol decanoate... a long acting anti-psychotic" that lasts "maybe 2, possibly 3 weeks with the first injection." (Tr. at 57). Dr. Cherry also administered "a short acting Haldol for immediate effect." (Id.). Dr. Cherry explained that the long acting Haldol was not used during the first incident "because I had no knowledge of [Defendant's] reaction to Haldol, so that was a test. And I did not feel comfortable at that time giving her a long acting anti-psychotic until I can tell she has no adverse reaction to it." (Id.).

Dr. Cherry identified Risperdal as the best choice for future medication of the Defendant since long-term use of typical anti-psychotic medications like Haldol can cause "Tardive dyskinesia" which is a side-effect "more likely with... older females." (Tr. at 60-61). Dr. Cherry specified that if the Court were to order the involuntary medication of Defendant, she would administer Risperdal "every 2 weeks" by injection. (Tr. at 60). Dr. Cherry identified one possible side-effect of Risperdal as diabetes but noted that "[i]t is believed to be less than 5 percent", that "usually when the medication is reduced or withdrawn the diabetes resolves" and that "we have long-range and short-range methods" of monitoring Defendant's blood-sugar for signs of diabetes. (Id.). Dr. Cherry also identified "sudden death" as a possible side-effect when typical anti-psychotics like Haldol that are "given I.V." but cautioned that if she were to administer anti-

-17-

psychotics to the Defendant it would be through an injection to the muscle which is "much more slowly diffused."(Tr. at 63-64). Dr. Cherry also noted that atypical anti-psychotics like Risperdal may make a patient "1.5 times as likely to die" if "given to patients with a dementia-related psychosis" but added that "Miss Mesfun was not diagnosed with a dementia-related psychosis." (Tr. at 65, 68).

Dr. Cherry said that as a result of the administration of the long acting Haldol after the second incident "Miss Mesfun actually had a very good response, kind of early response, more than I see sometimes in other patients." (Tr. at 69). Defendant was "much more friendly and agreeable", "started coming out of her cell for showers", "being superficially socially appropriate with staff" and "did not have the periods of yelling that she had before." (Tr. at 68). Dr. Cherry estimated that "the benefit probably lasted maybe 2 weeks after the second injection." (Tr. at 68-69).

Dr. Cherry concurred with Dr. Gregg's estimate that future treatment may take several months to restore competency and added that "[u]sually when someone is given antipsychotics, most of the treatment gain occurs in the first 6 weeks. Typically for delusions that can take a little bit longer." (Tr. at 62). During cross-examination Dr. Cherry also agreed that if Defendant did not respond well to the initially prescribed medication, treatment could extend beyond this typical 6 week period. (Tr. at 93). Dr. Cherry testified that she would expect an "initial response" to the medication "in a few weeks" and that "if I saw no response at all after perhaps 4 weeks, I would probably try a different medication if I found no benefit at all". (Tr. at 72). If Defendant were not involuntarily medicated, Dr. Cherry testified that she did not believe there would be

-18-

other grounds, such as dangerousness, to involuntarily institutionalize the Defendant and that

FMC's "social workers [would] contact agencies in the community to try and find placement and

care for her" but that "we don't have an ability to force [the agencies] to do so." (Tr. at 74-76).

When asked about the rate of success with restoring competency through anti-psychotic

medication, Dr. Cherry replied:

> With any one medication, and they all really have similar
> efficacy. It's around 60 percent and it's probably actually higher
> than that. About 60 percent are able to stay on the first medication
> that you try. And about 40 percent, in that 40 percent group, people
> go off of the medication either because of intolerable side effects,
> maybe they developed elevated blood sugar or gained too much
> weight or just don't feel good, have nausea. And the other reason to
> withdraw the medication is because it's not efficacious. And there
> is really no way to know ahead of time with a patient which
> medication will work.
>
>          ***
>
> It's 60 percent for an individual medication. If she did not
> respond, I would have to try another medication.
> So, Dr. Greg's figure of closer to 70 or 80 percent would, as
> far as developing competency to stand trial, that probably has to do
> with being able to try her medication. So with any one medication
> usually it's about 60 percent of patients are helped by it. (Tr. at 61,
> 63).

Dr. Cherry clarified this estimate after being pressed by Defendant's counsel by testifying that

"sixty percent of people become less psychotic that respond to the medications" but that she

didn't "really know how to answer that whether [Defendant] would become more competent or

not." (Tr. at 97). Dr. Cherry also admitted that she was not aware of any statistics regarding the

likelihood of physical side-effects or emotional blunting with patients who are prescribed

Risperdal. (Tr. at 99-100). Although Dr. Cherry agreed that Defendant's condition had worsened

since incarceration, she denied that moving Defendant to a more familiar setting could decrease her psychosis. (Tr. at 105-107).

In the closing statements of the Sell hearing the Government argued that it had satisfied all four of the Sell factors through the evidence introduced into the record and testimony during the hearing. Defendant's counsel argued that the Government had failed to show that restoration of competency was substantially likely with involuntary medication and that less intrusive alternatives, such as moving Defendant to a more comfortable environment, would not improve Defendant's condition.

### G. Current Mental Health Status of Defendant and Additional Information

On February 9, 2009, the Court received another letter from Warden W. Elaine Chapman at FMC Carswell regarding Defendant's current condition. Warden Chapman wrote that "[Defendant] continues to refuse admission to the Mental Health Inpatient (M1) Unit, as she maintains she is not mentally ill." (Feb. 9, 2009 Letter at 1). Warden Chapman also wrote that "[Defendant] is maintaining adequate nutrition and is not exhibiting behaviors considered dangerous to herself or others." (Id.). On May 28, 2009, in response to a request for more information from the Court, Dr. Cherry expanded upon her testimony regarding the dosage of Risperdal and the likelyhood of sedatory effects. She stated that "the starting dose of [Risperdal Consta] is 25 milligrams every two weeks" and that the "dose may be titrated up to 50 milligrams" if a patient does not respond to the 25 milligram does or a "intermediate dose of 37.5 milligrams." (May 28, 2009 Letter at 1). Dr. Cherry noted that "dosage increases [should] be made no more frequently than every four weeks." (Id.). The doctor also noted that based upon a

clinical trial conducted by the drug manufacturer, the sedatory side-effect of Risperdal occurs "with a frequency of five percent of patients" at 25 milligrams and "six percent of patients" at 50 milligrams. (Id.).

## DISCUSSION

The Supreme Court has observed that "[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." Washington v. Harper, 494 U.S. 210, 229, 110 S. Ct. 1028, 1041 (1990).  As such, a prisoner "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause."  Riggins v. Nevada, 504 U.S. 127, 134-35, 112 S. Ct. 1810, 1814 (1992); see Harper, 494 U.S. at 221-22.  However, in certain "rare" instances an essential or overriding state interest might overcome this liberty interest.  Sell, 539 U.S. at 178-80. As example, the Government may involuntarily administer drugs to render a defendant competent to stand trial.  Id. Before doing so, however, it must be determined that "the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests."  Id. at 179; see U.S. v. Grape, 549 F.3d 591, 599-600 (restating Sell four-factor test) (3rd Cir. 2008) .

The Court must consider the Government's motion involuntary medication in accordance with the four-prong Sell test.  The Supreme Court, however, has instructed that before engaging in this analysis, a court must make a threshold determination as to whether it is appropriate to involuntarily medicate a defendant for a different purpose, such as "purposes . . . related to the

individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk." Id. at 181-82; see Grape, 549 F.3d at 599 ("We do no reach consideration of the four-factor Sell test unless an inmate does not qualify for forcible medication under Harper";: see also U.S. v. Hernandez-Vasquez, 513 F.3d 908, 914-15 (9th Cir. 2008); U.S. v. Morrison, 415 F.3d 1180, 1185-86 (10th Cir. 2005); U.S. v. Gomes, 387 F.3d 157, 160 (2d Cir. 2004). The Supreme Court emphasizes that "[t]here are often strong reasons for a court to determine whether forced administration of drugs can be justified on these alternative grounds before turning to the trial competence question." Sell, 539 U.S. at 182. Accordingly, the Court will assess first whether involuntary medication is permitted for a "different" purpose and, if not, whether, in accordance with Sell, the Government may involuntarily medicate Defendant for the sole purpose of rendering her competent to stand trial.

### A. Involuntary Medication for a "Different" Purpose

In Harper the Supreme Court held that "the Due Process Clause permits the . . . treat[ment of] a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." 494 U.S. at 227. In its brief, the Government states that "[b]ecause defendant Ghenet Mesfun has been found not to present a danger . . . involuntary medication is sought to restore her competence to stand trial and not on any alternate grounds." (Gov.'t's Br. (Docket Item 57-2) at 3 n.1.) And, both Drs. Gregg and Cherry have presented their medical opinions that Defendant is not dangerous to herself or others. (See May 8, 2008 Update at 2; Nov. 2, 2007 Eval. at 5.; Tr. at 25, 69-70).

In the May 8, 2008 Mental Health Update, however, Drs. Gregg and Cherry noted two incidents when Defendant "has had to be given emergency medications . . . due to psychotic behavior that was compromising her own safety." (May 8, 2008 Update at 1.)  On February 28, 2008, Defendant "received emergency medications . . . after she tied a torn piece of sheet around her neck and told staff members it was to hold her veins in place," and on March 18, 2008, Defendant "received emergency medications . . . for the purpose of moving her to a clean cell and giving her medications to improve her mental functioning to help her regarding maintaining at least minimal hygiene." (Id.)  Moreover, in his May 23, 2008 letter responding to the Court's inquiry as to whether Defendant was fit to travel to New Jersey for the Sell hearing, Dr. Gregg stated that if Defendant were to travel to New Jersey, "[s]he would need to be constantly observed and maintained on Suicide Watch while in transit and following arrival."[5] (May 23, 2008 Letter).

In Sell the Supreme Court directed lower courts to "determine whether the Government seeks, or has first sought, permission for forced administration of drugs on these other Harper-type grounds; and, if not, why not." 539 U.S. at 183; see Hernandez-Vasquez, 513 F.3d at 914-15; Morrison, 415 F.3d at 1185-86.  In this case, the Government does not seek and has not sought permission for involuntary medication on "other Harper-type grounds."  Although Dr. Cherry testified that two earlier incidents required the emergency involuntary medication of

---

[5] In the May 23, 2008 letter, Dr. Gregg also noted that Defendant "recently tied a string around her neck and threatened to choke herself." (May 23, 2008 Letter.)  It is unclear whether this incident is the same as that from February 28, 2008. No clarification was made at the June 19, 2008 Sell hearing.

Defendant due to danger to herself and that her condition has worsened since being admitted to FMC (Tr. at 105-107), both doctors ultimately concluded that Defendant has not reached the point of being a danger to herself or others to the extent that long-term non-emergency involuntary medication under Harper is warranted (Tr. at 25, 69-70). Moreover, in her February 9, 2009 letter, FMC Warden Chapman restates that Defendant "is maintaining adequate nutrition and is not exhibiting behavior considered dangerous to herself or others." (Feb. 9, 2009 Letter at 1). Based upon the unchallenged evidence that Defendant does not qualify for involuntary medication on Harper grounds, the Court is satisfied that the Government's motion to pursue involuntary medication under Sell is merits consideration.

### B. Involuntary Medication for the Purpose of Restoration of Competency for Trial

As stated, to order the involuntary medication for the purpose of restoration of competency for trial, a court must make four conclusions – (1) "important governmental interests are at stake;" (2) "involuntary medication will significantly further those concomitant state interests;" (3) "involuntary medication is necessary to further those interests;" and (4) "administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition." Sell, 539 U.S. at 180-81 (emphasis added). Although in Sell the Supreme Court did not articulate the standard of proof governing consideration of these four factors, the Third Circuit has held, in line with other courts of appeals, that "the Government bear the burden of proof on factual questions by clear and convincing evidence" for all four factors of the Sell test. Grape, 549 U.S. at 598-599 (citing Gomes, 387 F.3d at 159).

### I. Important Governmental Interests Are at Stake

-24-

According to the Supreme Court, "[t]he Government's interest in bringing to trial an individual accused of a serious crime is important." Sell, 539 U.S. at 180. As such a relevant issue is whether Defendant is accused of committing serious crimes.

In U.S. v. Grape, the Third Circuit observed that "[c]ourts of appeals have split on which test to employ in determining the seriousness of the crime" under Sell. Grape, 549 F.3d at 600. The facts of Grape are especially germane to the case at hand since it is the only Third Circuit opinion to date which has applied the Sell test. The underlying facts of Grape were summarized in this introduction to the Court's opinion:

> John Douglas Grape suffers from a long history of serious mental illness and is currently incarcerated pending trial on two charges involving the receipt and possession of child pornography. The District Court initially found Grape incompetent to stand trial on these charges, and the Government correspondingly wished to medicate him involuntarily pursuant to [Sell], to render him competent. The District Court agreed with the Government and ordered Grape forcibly medicated following a Sell hearing. The District Court's order was stayed and Grape filed this interlocutory appeal... However, Grape subsequently assaulted a corrections officer, and the Government then medicated him involuntarily on account of his dangerousness... The District Court later deemed Grape competent. Grape wishes to pursue this appeal because the Government intends to use the District Court's original Sell order should Grape again become incompetent. (Grape, 549 F.3d at 592-93).

The Court in Grape did not provide a specific rubric to guide this Court's determination of the "seriousness" of crime. However, the Court did state that "[w]hether Grape's alleged crimes are serious is not in question." Grape, 549 F.3d at 600. Grape's offenses carried with them a "statutory mandatory minimum" sentence of "fifteen years" and "ten years" based upon a earlier rape conviction. Considering a "best case scenario" in light of Grape's "assessed... criminal

-25-

history category of III" the Court determined that Grape faced between "87 to 108 months' imprisonment under the Guidelines." The Court noted that "Grape thus concedes that his offenses qualify as serious under either test, and we agree." Id.

Here, the Government argues that Defendant "is accused of multiple serious crimes," some of which "are punishable by up to twenty years in prison." (Gov.'t's Br. (Docket Item 57-2) at 4.) As noted in the introduction, Defendant faces maximum penalties ranging from five years to twenty years. And, if the Court considers the guideline range for each offense, Defendant faces advisory sentences ranging from ten to sixteen months to forty-one to fifty-one months. Although these offense levels do not reach the levels in Grape, they are nevertheless significant. There can be no doubt that the crimes of which Defendant is accused are serious. cf., U.S v. Valenzuela-Puentes, 479 F.3d 1220, 1226 (10th Cir. 2007) (ruling that "maximum sentence of twenty years and a likely guideline sentence of six to eight years [are] sufficient to render the underlying crime 'serious'"); U.S. v. Evans, 404 F.3d 227, 238 (4th Cir. 2005) (holding that "a felony whose maximum term of imprisonment is 10 years – is 'serious' under any reasonable standard").

Analysis of whether important governmental interests are at stake does not end with the simple conclusion that a defendant is accused of a serious crime. The Supreme Court provides that "[c]ourts . . . must consider the facts of the individual case in evaluating the Government's interest in prosecution" because "[s]pecial circumstances may lessen the importance of that interest." Sell, 539 U.S. at 180. One circumstance is where "[t]he defendant's failure to take drugs voluntarily . . . mean[s] lengthy confinement in an institution for the mentally ill . . .

-26-

diminish[ing] the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." Id. Courts, however, must also acknowledge the Government's "substantial interest in timely prosecution" and the difficulty or impossibility of trying "a defendant who regains competence after years of commitment during which memories may fade and evidence may be lost" if civil commitment is possible in a given case. Id. Another circumstance is where "the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed . . .)." Id. The Tenth Circuit has interpreted this to mean that "when the amount of time the defendant is confined pending determination of competency is in parity with an expected sentence in the criminal proceeding, the Government may no longer be able to claim an important interest in prosecution." U.S. v. Bradley, 417 F.3d 1107, 1116 (10th Cir. 2005).

With respect to whether Defendant would be subject to a lengthy confinement in an institution for the mentally ill if this Court were to deny the order for involuntary medication, the Government asserts that "[a]bsent a showing that [] defendant's release would pose a 'substantial risk of bodily injury to another person or serious damage to property of another,' the defendant is unlikely to be committed to an institution pursuant to 18 U.S.C. § 4246." (Gov.'t's Br. (Docket Item 57-2) at 5.) Dr. Cherry also testified at the Sell hearing that Defendant was unlikely to be involuntarily committed and that without involuntary medication FMC Carswell would seek to have Defendant voluntarily admitted to a community facility. (Tr. at 74-76). The Court finds that the possibility of involuntary commitment is minimal and does not "lessen the importance" of the Government's interests.

-27-

As for whether Defendant's time-served would substantially limit the length of Defendant's sentence, the Government claims that "while the defendant has been in custody for approximately two years [at the time of the hearing], in this case where the maximum penalty is twenty years and the advisory United States Sentencing Guidelines range is substantial . . . this is not a case where the 'time served plus time to regain competency could result in incarceration longer than potential sentence.'" (Id.) The Court recognizes that the Defendant has now spent over three years in detention. However, in line with this Court's finding regarding the seriousness of Defendant's crimes, the Court agrees with the Government that the Defendant faces a considerable period of incarceration such that the time already spent in detention does not significantly weigh against important Government interests.

ii. Involuntary Medication Will Significantly Further Government Interests

A court is required to make two findings in order to conclude that involuntary medication will significantly further the concomitant state interests – (1) "administration of the drugs is substantially likely to render the defendant competent to stand trial;" and (2) "administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." Sell, 539 U.S. at 181. The Third Circuit's decision in Grape does not provide any guidance on this factor of the Sell test since Grape's previous restoration to competency prompted the Court to find that it "need not consider the research and scientific and empirical evidence the parties debated regarding the likelihood that antipsychotic medications would restore Grape to competency." Grape, 549 F.3d at 605.

-28-

The Fourth Circuit has emphasized that to satisfy these requirements, the Government's presentation must focus on the specific defendant. Evans, 404 F.3d at 242 (The Government must "demonstrat[e] that the proposed treatment plan, as applied to this particular defendant, is 'substantially likely' to render the defendant competent to stand trial and 'substantially unlikely' to produce side effects so significant as to interfere with the defendant's ability to assist counsel in preparing a defense."). Further, as part of this specific presentation, the Fourth Circuit held that the Government "must set forth the particular medication, including the dose range, it proposes to administer . . . to restore . . . competency." Id. at 241; cf. Hernandez-Vasquez, 513 F.3d at 911 ("[A] Sell order must provide at least some limitations on the medications that may be administered and the maximum dosages and duration of treatment.").

There is no bright-line percentage guiding a court's determination as to whether administration of the drugs is substantially likely to render the defendant competent to stand trial. The Second Circuit concluded that a district court's finding that restoration of competency was substantially likely after the district court relied, in part, on "the BOP's 70 percent success rate in restoring defendants to competence through treatment (voluntary or not) with anti-psychotic medication" was not clearly erroneous. Gomes, 387 F.3d at 161-62; cf. U.S. v. Moruzin, 583 F. Supp. 2d 535, 547 (acknowledging "that clear and convincing evidence that the administration of Haldol would be eighty-five percent likely to restore [defendant's] competency would satisfy Sell's substantial likelihood criterion")(citations omitted). And, the Eighth Circuit has held that

"[a] five to ten percent chance of restored competence cannot be considered substantially likely under any circumstances." U.S. v. Ghane, 392 F.3d 317, 320 (8th Cir. 2004).[6]

The Government claims that Dr. Gregg's November 2, 2007 Forensic Evaluation "found . . . that 'there is a substantial probability Ms. Mesfun will become competent following psychiatric treatment' . . . and that if treated she 'would demonstrate a positive response to psychiatric treatment,' making her otherwise 'guarded' prognosis 'fair to good.'" (Gov.'t's Br. (Docket Item 57-2) at 6.)  Moreover, the Government highlights that Dr. Cherry's November 13, 2007 Psychiatric Report noted that antipsychotic medications "have been shown to be effective by scientific studies in conditions such as hers, and have been used for treatment for this type of condition for many years'" and that these medications would result in "improvement in rational thought and the lessening of inappropriate emotions.'" (Id.)  Accordingly, the Government concludes that "these findings therefore establish a substantial probability that medication will restore the defendant's competence to stand trial by addressing the 'irrational reaction[s]' and 'paranoid attitudes' manifested by the defendant's current symptoms." (Id.)

In the November 2, 2007 Forensic Evaluation, Dr. Gregg expressed the following opinions with respect to the likelihood that administration of drugs will render Defendant competent to stand trial:

---

[6] It bears repeating that in relying on any percentage to determine whether medication is substantially likely to render a defendant competent to stand trial, courts must be cognizant of the particular defendant as the Fourth Circuit emphasized in Evans.  As example, the Tenth Circuit reversed and remanded a case where "the district court provided no explanation as to whether or why it had become clearly convinced that [the defendant] could be rendered competent through medication despite his exceptionally low IQ." Valenzuela-Puentas, 479 F.3d at 1229.

- "[I]n our opinion, psychotropic medication is a medically appropriate treatment for Ms. Mesfun's illness," (Nov. 2, 2007 Eval. at 4);
- "Ms. Mesfun's prognosis is guarded. Her refusal to accept the concept that she may be mentally ill and to participate even in diagnostic and exploratory treatment efforts of her condition is quite unlikely without forced medication. We expect that Ms. Mesfun would demonstrate a positive response to psychiatric treatment. If she were to receive such treatment, her prognosis would be fair to good," (id.);
- "It is further my opinion that there is a substantial probability Ms. Mesfun will become competent following psychiatric treatment;" (id. at 5); and
- "In the opinion of Ms. Mesfun's psychiatrist, Judith Cherry, D.O., psychotropic medication is medically appropriate to treat Ms. Mesfun's condition . . . .," (id.).

Additionally, in his November 13, 2007 report, Dr. Cherry expressed the following as to the likelihood that administration of drugs will render Defendant competent to stand trial: "It is my opinion, Ms. Mesfun requires treatment with an antipsychotic medication. These medications have been shown to be effective by scientific studies in conditions such as hers and have been used for treatment for this type of condition for many years." (Nov. 13, 2007 Report at 1.)

Standing alone, the opinions expressed in the November 2, 2007 Forensic Evaluation and the November 13, 2007 Psychiatric Report are insufficient to clearly convince this Court that administration of the drugs is substantially likely to render Defendant competent to stand trial. However, when combined with the May 8, 2008 Mental Health Update, and Drs. Gregg and Cherry's testimony at the June 19, 2008 Sell hearing, a detailed evaluation of Defendant's potential for restoration as a result of involuntary medication emerges. The May 8 report and Sell hearing testimony address Defendant's previous reaction to anti-psychotic drugs. Drs. Gregg and Cherry stated that "after being given emergency psychiatric medications, [Defendant's] behavior improved markedly for several days, suggesting the potential for a positive response to treatment

with psychiatric medications," (May 8, 2008 Update at 1), and that "Ms. Mesfun has shown an ability to respond to antipsychotic medication on the two occasions of being administered emergency medications at this facility," (Id. at 2).[7] Dr. Cherry expanded upon these observations at the Sell hearing by testifying that Defendant had a "very good response" to the long-acting Haldol administered during the second incident. (Tr. at 69). Dr. Cherry stated that based upon Defendant's psychosis diagnosis and her reaction to the previously administered anti-psychotic medication, she estimated that Defendant had a "60%" chance of responding positively to Risperdal. (Tr. at 61). Dr. Gregg testified that based upon "research that had been published concerning people with delusional disorder" he estimated that if Defendant responded well to the antipsychotic medication "there is probably a 75 percent change that she would improve to the point where she would be competent to stand trial." (Tr. at 23). The Court finds that based upon the successful administration of anti-psychotic medication on two previous occasions, Dr. Cherry's testimony that Defendant has a 60% chance of responding to the Risperdal and Dr. Gregg's statement that patients with Defendant's psychosis have a 75% chance of being restored to competency by anti-psychotic medication, the Government has carried its burden to show that the involuntary medication of Defendant with Risperdal is substantially likely to restore Defendant to competency.

---

[7] The May 8, 2008 Mental Health Update also includes the statement that "[t]hese medications have been shown to be effective by scientific studies in conditions such as hers and have been used for treatment for this type of condition for many years." (May 8, 2008 Update at 2.)

In determining whether administration of the drugs is <u>substantially unlikely</u> to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair, a court must be sure to restrict its assessment to those side effects that would interfere with a defendant's ability to mount her defense. As example, the Fifth Circuit rejected a defendant's argument "because while he ha[d] demonstrated that the side effects will be unpleasant, he ha[d] not shown how his ability to assist in his defense will be substantially undermined by the medication." <u>Palmer</u>, 507 F.3d at 304.

The Government marshals all of the details regarding side effects from Dr. Cherry's November 13, 2007 Psychiatric Report and asserts that "[s]ignificantly, the side effects discussed raise medical issues, but do not implicate mental functioning, and therefore do not pose a risk that they 'will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense.'" (Gov.'t's Br. (Docket Item 57-2) at 7.)  The Government then showcases Dr. Cherry's statement that "in [her] experience treating individuals with this type of problem, [she has] never encountered a side effect that endangered the fairness of a trial.'" (<u>Id.</u>)

From this testimony, it appears that most of the fatal or highly-uncomfortable side effects can be minimized to a very large degree, if effectively monitored and if medication is adjusted accordingly.  The only "less serious," as Dr. Cherry says, side effect that concerns the Court with respect to whether administration of the drugs is substantially likely to have side effects that will render the trial unfair is sedation.  According to Dr. Cherry, however, the sedating "effect tends to lessen over time and whatever effect remains is completely offset by the improvement in rational thought and the lessening of inappropriate emotions."  (Nov. 13. 2007 Report at 2.) Dr.

Cherry's May 28, 2009 letter additionally reveals that the likelyhood of sedation is between 5-6%
depending on the dosage of Risperdal. (May 28, 2009 Letter at 1).

The Government has satisfied its burden of showing by clear and convincing evidence
that there is a substantial likelihood that Defendant will be restored to competency by the
involuntary administration of Risperdal. The Court also finds that the additional information
provided by Dr. Cherry in her May 28, 2009 letter is convincing evidence that Defendant is
"significantly unlikely" to suffer sedatory side-effects from Risperdal. The Government has
satisfied the second prong of the Sell test.

iv. Involuntary Medication Is Necessary to Further Those Interests

To conclude that involuntary medication is necessary to further the concomitant state
interests, "[t]he court must find that any alternative, less intrusive treatments are unlikely to
achieve substantially the same results." Sell, 539 U.S. at 181. Moreover, "the court must
consider less intrusive means for administering the drugs, e.g., a court order to the defendant
backed by the contempt power, before considering more intrusive methods." Id.

Quoting from Dr. Gregg's November 2, 2007 Forensic Evaluation, the Government
argues that "psychotropic medication 'is the only method by which Ms. Mesfun can be restored
to competence" and is the "only viable treatment option." (Gov.'t's Br. (Docket Item 57-2) at 9.)
The Government also points to Dr. Gregg's statement that "Ms. Mesfun has consistently refused
all attempts to engage in [psychological and psychiatric] treatments' . . . and has 'steadfastly
refused to accept psychotropic medication treatment." (Id.) According to the Government, Dr.
Cherry's November 13, 2007 Psychiatric Report concluded that "other less intrusive forms of

-34-

treatment, such as psychotherapy have shown to be completely ineffective." (Id.) At the Sell hearing, Dr. Gregg restated his conclusion that all attempts to engage Defendant in voluntary treatment of her psychosis had failed. (Tr. at 24). Dr. Gregg also denied the assertion by Defendant's counsel that moving Defendant to a more familiar environment, such as the family home, would likely result in an improvement in Defendant's psychosis. (Tr. at 46).

It is clear (1) that Defendant refuses to acknowledge the possibility that she may have a mental illness and (2) that Defendant, in her current state, refuses to participate in any psychiatric or psychological examinations or treatments. (See Nov. 2, 2007 Eval.; May 8, 2008 Update; Tr. at 24, Feb. 9, 2009 Letter) Dr. Gregg opined that "no less-intrusive alternatives exist which will effectively treat Ms. Mesfun's mental illness." (Nov. 2, 2007 Eval. at 4.) Dr. Cherry reported that "[o]ther less intrusive forms of treatment, such as psychotherapy have shown to be completely ineffective." (Nov. 13, 2007 Report at 1.) Dr. Cherry also indicated that because "it is unlikely that [Defendant] would agree to take an oral medication . . . [they] will probably be forced to use an injectable long acting antipsychotic medication." (Id.) And, Drs. Gregg and Cherry reiterated that "[o]ther less intrusive forms of treatment, such as psychotherapy have shown to be completely ineffective and Ms. Mesfun has no receptivity to psychotherapy since she does not believe that she is mentally ill." (May 8, 2008 Update at 2.)

Accordingly, the Court concludes that alternative, less intrusive treatments are unlikely to achieve substantially the same results.

v. Administration of the Drugs Is Medically Appropriate

To determine whether administration of the drugs is medically appropriate or, that is, in the patient's best medical interest in light of her medical condition, "[t]he specific kinds of drugs at issue may matter here as elsewhere" because "[d]ifferent kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success." Sell, 539 U.S. at 181. The Fourth Circuit has held:

> [T]he government must spell out why it proposed the particular course of treatment, . . . provide the estimated time the proposed treatment plan will take to restore the defendant's competence and the criteria it will apply when deciding when to discontinue the treatment, describe the plan's probable benefits and side effect risks for the defendant's particular medical condition, . . . show how it will deal with the plan's probable side effects, and explain why, in its view, the benefits of the treatment plan outweigh the costs of its side effects.

Evans, 404 F.3d at 242.

During the Sell hearing, Dr. Cherry testified that she believed that Risperdal was the best choice for treating Defendant since it could be administered by injection and did not put Defendant at risk for tardive dyskinesia (Tr. at 60-61). Dr. Cherry testified that each injection would last for 2 weeks and that within the period of the first injection Dr. Cherry would be able to determine if Defendant was reacting positively to Risperdal. (Tr. at 60). Dr. Cherry also testified that if Defendant reacts positively to Risperdal, 6-8 weeks of treatment would be required to restore Defendant to competency. (Tr. at 62) Dr. Cherry identified diabetes as a possible side-effect that could be reversed by stopping treatment and stated that Defendant's blood-sugar levels would be monitored both "long-range" and "short-range". (Tr. at 60) Dr. Cherry also identified increased mortality as a possible side-effect to treatment with Risperdal but noted that this danger is limited to patients suffering from dementia-related psychosis, which

-36-

is not Defendant's diagnosis. (Tr. at 65, 68) Finally, Dr. Cherry noted that any sedatory side-effects of Risperdal were likely to be off-set by Defendant's increased ability for rational thinking but that Defendant would be closely monitored in the first few weeks of treat to determine if the sedatory side-effects were so great as to require termination of treatment with Risperdal. (Tr. at 102-103)

Considered as a whole, these elements of Dr. Cherry's testimony appear to constitute a comprehensive treatment plan for restoring Defendant's competency through the administration of Risperdal. There was, however, a key piece of information missing, the maximum dosage of Risperdal to be administered to the patient. Other Circuit Courts have held that in order to satisfy the "medically appropriate" requirement in Sell, the Government must specify the maximum dosage of the medication to be prescribed to the patient. see Evans, 404 F.3d at 241-42 ("it is necessary for the government to set forth the particular medication and dose range of its proposed treatment plan"); Hernandez-Vazquez, 513 F.3d at 911 ("[A] Sell order must provide at least some limitations on the medications that may be administered and the maximum dosages and duration of treatment."). Although the Third Circuit in Grape did not consider this fourth prong of the Sell test, it did cite both Evans and Hernandez-Vazquez for guidance on its application of other aspects of the Sell test. Grape, 549 F.3d at 598, n. 7 (citing Evans and Hernandez-Vazquez to support application of de novo standard of review of first Sell factor); Grape, 549 F.3d at 598 (citing Hernandez-Vazquez to support application of clear error standard of review to Sell factors two through four); Grape, 549 F.3d at 599, n. 9 (citing Evans to support application of clear and convincing evidence standard to Government's burden for all factual questions under the Sell

test). The Court believes that if the Third Circuit were to address the question of what the Government must include in its treatment plan, it would follow <u>Evans</u> and <u>Hernandez-Vazquez</u> and require the Government to provide specific dosages of medication.

In response to the Court's specific inquiry, Dr. Cherry stated in her May 28, 2009 letter that she would start defendant on a 25 milligram dosage of Risperdal Consta administered every two weeks, observe patient for at least three weeks and then increase the dosage to 37.5 milligrams after the fourth week if the original 25 milligram dosage proved ineffective. Dr. Cherry also stated that she would stop administering Risperdal Consta if defendant showed no improvement at the maximum dosage of 50 milligrams. Based upon this information the Court is satisfied that the Government has carried its burden to provide a detailed treatment plan.

**CONCLUSION**

The Court has reviewed both the reports and the testimony offered by the Government. The Government has provided considerable evidence to support its motion for involuntary medication of Defendant, including the likelihood of side-effects which may impact Defendants ability to assist in her own case and the dosage of Risperdal to be administered to the Defendant. The Government's motion for involuntary medication of the Defendant is **GRANTED** and the Court directs FMC Carswell to medicate the defendant according to the following treatment plan:
- Administer 25 milligrams of Risperdal Consta on a bi-weekly basis;
- If defendant has not been restored to competency after three doses of Risperdal Consta at 25 milligrams, over a total period of 6 weeks, administer 37.5 milligrams of Risperdal Consta;

-38-

- If defendant has not been restored to competency after three doses of Risperdal Consta at 37.5 milligrams, over a total period of 6 weeks, administer 50 milligrams of Risperdal Consta;

- If defendant has not been restored to competency after three doses of Risperdal Consta at 50 milligrams, over a total period of 6 weeks, FMC Carswell shall inform the Court of its findings during the treatment and observation period  and stop the involuntary medication of defendant for the purpose of restoring competency until further directed by this Court.

United States Senior District Judge